IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 9, 2002 Session

## EDWARD PAUL SILVA v. ALBERT W. BUCKLEY, JR.

**Appeal from the Chancery Court for Williamson County**

**No. 27884      Russ Heldman, Judge**

---

**No. M2002-00045-COA-R3-CV - Filed December 31, 2003**

---

PATRICIA J. COTTRELL, J., dissenting.

I respectfully dissent from the majority's holding that the agreement herein established a basis for a results-oriented fee that totaled more than three times the amount billed on an hourly basis. The majority finds the contract less than crystal clear and relies upon the trial court's credibility finding to hold that Mr. Buckley understood the agreement to provide for an unascertainable, undefined amount to be determined by application of the listed factors. I disagree with the impact of the trial court's credibility finding because that finding was based upon the court's interpretation of the written agreement as unambiguous and does not represent a determination regarding which witness's version of their discussions is more believable. Additionally, I would find that the written agreement itself did not establish the mutual understanding requirement and the attorney failed to prove that he otherwise informed the client of the nature of the arrangement as envisioned by the lawyer.

## I. BACKGROUND

The attorney, Mr. Silva, testified that he intended that the contract provide for something he called a "results" fee; that is, some amount other than and additional to the hourly fee, to be determined after the divorce case was concluded and the results were known. The client, Mr. Buckley, takes the position that the contract itself does not provide for such a fee or is so indefinite as to be unenforceable and that he never understood the agreement to include any additional, bonus, or "results" fee. The attorney considered the result he obtained in the divorce action extremely good. Mr. Buckley does not dispute the quality of representation provided, stating Mr. Silva "did a great

job," that he was pleased with the result, and that Mr. Silva had been everything he wanted in a trial lawyer.[1]

Although not the subject of litigation in this state very often, the result fee is not unheard of. Dissatisfaction with hourly billing among both lawyers and clients has led to consideration and use of alternative methods. One of those is the result fee, which has been described in various ways, including:

> Result fees, also known as success or retrospective fees, are an additional fee assessed by the attorney at the conclusion of the case based on the outcome of the case and the skill required to achieve the result. Result fees specifically "endorse a surcharge for beneficial results to the client." Result fees may be imposed in conjunction with an hourly fee or a flat fee and can be structured as either a maximum or minimum fee. They are similar to contingent fees in that the amount of additional fee the lawyer earns, if any, is contingent on a favorable result for the client. Result fees can be distinguished from contingency fees, however, in that the contingent fee applies whenever there is any recovery while result fees focus on the content of the recovery, and the extent to which it met the client's objectives. This billing method has the obvious advantage of perfect hindsight in setting the final fee to be charged to the client, and "because the judgment as to the amount of the fee is subjective, it can be more equitable than if some mechanical system is utilized." This type of fee arrangement requires a great deal of trust between the attorney and client, and can lead to fee disputes where the client's perception of the achieved objective differs significantly from that of his counsel.

Linda J. Ravdin, "LEGAL ETHICS: Some Current Issues in the Practice of Family Law," 33 FAM. L. Q., Summer 1999, at 387, 397 (footnotes omitted).[2] Like all billing methods, the result fee has its supporters and detractors.

> Critics of hourly billing occasionally levy the attack that while the client stands to suffer if the outcome is poor, the attorney is not rewarded if the outcome is even more favorable than anticipated. In response, critics of premium billing liken such bonus-like compensation to paying a doctor an agreed-to amount X to perform a necessary operation, but X+a if the operation is a success. These critics contend that they would run from the examining room because they believe that the service

---

[1]Both parties conducted their discussions regarding the fee dispute with admirable civility and continued a professional relationship through the conclusion of the divorce case and its aftermath.

[2]At this point, I simply note that the fee structure described by Mr. Silva does not fit the foregoing description exactly. As the attorney described his intent with regard to the fee, there was no baseline or minimum fee, other than the nonrefundable retainer. Thus, the result fee herein was not exactly a bonus or only a portion of the entire fee. Mr. Silva envisioned his total fee to be determined by consideration of the factors listed, and in his brief characterizes the fee as a results-oriented fee, reflecting the predominant emphasis he placed on that factor.

provider should always perform to the best of his or her abilities in return for valuable consideration or compensation, instead of premising the quality of service provided upon how much the attorney himself decides to bill, allegedly outside the control of the client. Otherwise, lawyers might be encouraged to perform at minimally acceptable standards for the initial fee but hold the client captive for greater remuneration in order to deliver more satisfactory or optimal results. This is not to say that this is how lawyers respond or will respond under such a regime, but the invitation is too great to be ignored, when the ethics of billing already are being questioned.

Adam C. Altman, 11 GEO. J. LEGAL ETHICS, Winter 1998, at 203, 228 (footnotes omitted).

The question before us, however, is not whether such an arrangement is a good thing or not. Instead, the question is what fee agreement the parties reached, if any.

The thrust of Mr. Silva's testimony was that he intended to charge a "result fee" if the results of the litigation were satisfactory, and the potential size of that fee would be determined by application of various factors and, apparently, Mr. Silva's determination of what was reasonable in view of those factors. When asked whether the agreement set forth a maximum and minimum range of fees, Mr. Silva testified that the minimum was the $2,500[3] retainer and the maximum was:

what a lawyer of ordinary prudence would believe a reasonable fee would be after applying the disciplinary rule standards and factors that are included in this engagement letter. The ceiling is based on what is reasonable under the Supreme Court and the floor is my retainer.

Mr. Silva acknowledged that he had not discussed an amount or range of figures until after the divorce case was over, obviously well after the engagement agreement was signed. Mr. Buckley maintained throughout these proceedings that he never understood there would be a fee other than the hourly fee and was never told about an undeterminable additional fee based upon results until after the divorce case was concluded.

The parties herein dispute the proper construction of the agreement, and the question of interpretation of a contract is a question of law. *Guiliano v. CLEO, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of this document is not entitled to a presumption of correctness on appeal. *Id.*; *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). This court must review the document ourselves and make our own determination regarding its meaning and legal import. *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

---

[3]A portion of the fee agreement acknowledges receipt of $2500 as a non-refundable retainer.

## II. THE LAW REGARDING ATTORNEY-CLIENT CONTRACTS

The trial court herein was not called upon to award a reasonable fee. Rather, the court was asked to interpret and enforce the contractual fee arrangement between the parties. Contracts between attorneys and their clients are subject to the general rules of contract law. *Alexander v. Inman*, 903 S.W.2d 686, 694 (Tenn. Ct. App. 1995) (*Alexander I*); *In re Ellis*, 822 S.W.2d 602, 607 (Tenn. Ct. App. 1991). The attorney-client relationship is essentially contractual. *Fell v. Rambo*, 36 S.W.3d 837, 852 (Tenn. Ct. App. 2000); *Starks v. Browning*, 20 S.W.3d 645, 650 (Tenn. Ct. App. 1999). However, the contractual relationship between an attorney and client is different from other contractual relationships.

> The relationship of attorney and client is "extremely delicate and fiduciary;" therefore, attorneys must deal with their clients in utmost good faith. This level of good faith is significantly higher than that required in other business transactions where the parties are dealing at arm's length. *Cooper & Keys v. Bell*, 127 Tenn. 142, 150, 153 S.W. 844, 846 (1913); *Alexander*, 903 S.W.2d at 693. The client must be able to trust the attorney to deal fairly at all times, including during the negotiation of the attorney's terms of employment. *Cummings v. Patterson*, 59 Tenn. App. 536, 541, 442 S.W.2d 640, 643 (1968).
>
> In this context, this Court has long held that an attorney is entitled to compensation in the amount agreed upon by contract, provided that the contract is fair at its inception and entered into in good faith. *Peoples Nat'l Bank of Washington v. King*, 697 S.W.2d 344, 346 (Tenn. 1985). In order to prove such good faith and fairness, and attorney seeking to enforce a contract for attorney's fees must show:
>
>> (1) the client fully understood the contract's meaning and effect,
>>
>> (2) the attorney and client shared the same understanding of the contract, and
>>
>> (3) the terms of the contract are just and reasonable.
>
> *Cooper & Keys*, 153 S.W. at 846 (citing *Planters' Bank of Tennessee v. Hornberger*, 44 Tenn. 531, 573 (1867).

*Alexander v. Inman*, 974 S.W.2d 689, 693-94 (Tenn. 1998)(*Alexander II*).

The burden placed on the attorney seeking to enforce a fee agreement to demonstrate (1) that the client fully understood the meaning and effect of the employment contract between them and (2) that the attorney and the client shared the same understanding of the agreement, reflects the obligation of an attorney to act in the utmost good faith in any transaction with his or her client. This principle is long-standing.

An attorney, dealing with his client for further professional services, and the contract is reduced to writing, is bound to show, when he seeks to enforce it, that the latter fully understood its meaning and effect, and that each understood it in the same sense, otherwise it can not be enforced.

*Union Planters Bank v. Hornberger*, 44 Tenn. 531, 572 (1867). The requirement that the attorney and the client share the same understanding of the fee agreement incorporates general contract law regarding meeting of the minds, but places it in the context of the fiduciary obligation of the attorney, whose duty it is to ensure that such a mutual understanding exists.

Because of the special fiduciary relationship between an attorney and client and the influence that relationship gives to an attorney with regard to the client, courts scrutinize most closely all transactions between an attorney and his or her client. *Hutchinson v. Crowder*, 8 Tenn. App. (Higgins) 114, 119 (1917). Consequently,

To sustain a transaction of advantage to himself with his client, the attorney has the burden of showing, not only that he used no undue influence, but that he gave his client all the information and advice which is (sic) would have been his duty to give if he himself had not been interested . . . .

*Id.* This rule is applicable to any contract between an attorney and his or her client, including a fee agreement. *Alexander I*, 903 S.W.2d at 694. The fiduciary obligations of the attorney extend to the process by which the attorney and client reach agreement on the terms of employment, including compensation. *Id.* at 693.

The Code of Professional Conduct in force in Tennessee at the time of the contract herein encouraged attorneys to reduce their employment agreements with clients to writing.[4] Whether the agreement is written or not, the attorney has the duty to ensure that the client has a clear understanding of how the fee will be calculated and billed. Tenn. S. Ct. R. 8, EC 2-19; *Alexander I*, 903 S.W.2d 686; *In re Estate of Davis*, 719 S.W.2d 526, 528 (Tenn. Ct. App. 1986). Our Supreme Court has held that an unambiguous written fee agreement can satisfy the ethical requirement that an attorney explain the fee arrangement and its basis, at least where the client is experienced with

---

[4]Tenn. S. Ct. R. 8, EC 2-19 states:

As soon as feasible after a lawyer has been employed, it is desirable that he reach a clear agreement with his client as to the basis of the fee charges to be made. Such a course will not only prevent later misunderstanding but will also work for good relations between the lawyer and the client. It is usually beneficial to reduce to writing the understanding of the parties regarding the fee, particularly when it is contingent. A lawyer should be mindful that many persons who desire to employ him may have had little or no experience with fee charges of lawyers, and for this reason the rationale for the particular fee arrangement proposed should be fully explained to such persons.

contracts and possesses business acumen or sophistication.[5] *Alexander II*, 974 S.W.2d at 695. In the case before us, the attorney's primary contention is that the written agreement at issue unambiguously set forth the fee arrangement as he describes it.

In the *Alexander II* case, the Tennessee Supreme Court considered a contractual fee arrangement for a highly contested divorce, entered into only four weeks before trial was scheduled, and involving a very large marital estate whose assets had not entirely been disclosed to or discovered by the client's former attorneys. The fee agreement in *Alexander* provided:

> The amount of the final fee to be paid by Client for legal services of Attorneys and lawyers and clerks under their supervision **shall be a reasonable amount** taking into consideration the time and labor required the novelty and difficulty of the questions involved, the skill required to perform the services properly, the amount involved and results obtained, and other relevant factors. Said final fee **shall not exceed** 15% of the total sum (in money and property) awarded to Client after commencement of the trial of said action for divorce for alimony *in solido*, for five years of alimony *in futuro*, and distribution and division of property, or 10% of such total sum awarded to Client by settlement prior to the commencement of such trial, provided that said fee **shall in no event be less than** (a) $10,000; or (b) the total amount on a time basis for work of Attorneys and other attorneys and clerks under their supervision at their usual hourly charges for work.

*Alexander II*, 974 S.W.2d at 690-91 (emphasis added).

The Court determined that the contract was subject to the criteria generally applicable to attorney fee agreements, as set out above.[6] In its analysis of the first two factors, the Court found that the client in *Alexander II* fully understood the agreement with her attorneys and had the same understanding as her attorneys. The Court found it was obvious the attorneys understood the

---

[5] Mr. Buckley was an experienced and successful business person, involved in real estate, and was familiar with contracts.

[6] The Supreme Court first determined that the fee agreement was not a contingent fee because, under the agreement, there was no question that the attorneys would be paid regardless of the outcome of the case. The Court determined that because payment itself was certain and only the amount of payment uncertain, the arrangement was not a contingent fee. Consequently, the Court held, the fee arrangement at issue was not subject to the enhanced considerations, such as a higher quantum of proof, applicable to contingent fee arrangements "begrudgingly" permitted in domestic relations cases. *Alexander II*, 974 S.W.2d at 693. The Court stated contingent fees in domestic relations cases are "unsavory," subjected to enhanced scrutiny, and rarely found to be justified. *Id*. The newly adopted Tennessee Rules of Professional Conduct, effective March 1, 2003, prohibit the charging or collecting of fees in a domestic relations matter "the payment **or amount**" of which is contingent upon the amount of support or the value of the property division. Although the retainer letter in the case before us does not make the fee contingent on the results of the case, the attorney testified that the fee was a "results" fee based upon the small property and support awards relative to the potential awards. Of course, the contract at issue herein predates the new Rules, and we are not presented with the question of whether those Rules would allow the type of arrangement described by the attorney herein.

agreement to allow them to charge up to fifteen percent of any award to the client. It also found that there was no plausible basis to conclude that the client did not understand the plain words of the contract, "Said fee shall not exceed 15% of the total sum (in money and property) awarded to Client."

Thus, the Supreme Court's findings as to the parties' understanding of the contract in *Alexander II* were premised on the court's interpretation of the fee agreement as unambiguous. The Court reiterated the ethical requirement that "an attorney should reach a clear agreement about fees with the client and should explain the reasons for preferring one arrangement over another," and found that requirement could be met by a written fee agreement. 974 S.W.2d at 695. The Court's decision was also largely based on the fact that the agreement plainly established minimum and maximum limits to the total amount of fees. In fact, the Court, in its discussion of whether the agreement was just and reasonable, stated that it was so because it provided for a minimum and maximum fee to be charged. "Indeed, the maximum fee provided a protection to [the client] by defining the limit beyond which the fee could not rise." *Id*. 974 S.W.2d at 695.

With regard to the just and reasonable factor, the Court found that the mere inclusion of the word "reasonable" and the provision of a minimum and maximum fee in the agreement do not alone make the agreement enforceable, and that the court was also required to determine whether the fee ultimately charged was a reasonable fee. The Court then determined that the fee at issue was within the range of reasonableness upon a careful analysis of the factors determining the reasonableness of an attorney's fees, specifically those set out in the fee agreement and those enumerated in *Connors v. Connors*, 594 S.W.2d 672, 676 (Tenn. 1980). Those factors are essentially the same as the factors set out in the agreement herein.

### III. THE CONTRACT HEREIN

In the case before us, the trial court concluded that the only issue was whether the $175,000 fee was reasonable. The court determined that the issue of whether the contract was fair and entered into in good faith was pretermitted by Mr. Buckley's Answer in which he admitted that he accepted and agreed to the terms and conditions of the engagement letter or fee agreement.[7] This conclusion is based on the premise that the fee agreement as written was unambiguous.

_____

[7]Counsel for Mr. Silva had made this argument at the close of plaintiff's proof. Similarly, Mr. Silva testified that when he received Mr. Buckley's answer, he interpreted it as admitting to the contract and admitting that services were performed under the contract and, therefore, that the only issue was the reasonableness of the fee. On appeal, Mr. Silva acknowledges that the Answer denied that Mr. Silva was entitled to the requested $117,079.43 because he was not entitled to anything more than a fee calculated by multiplying the hours worked by the hourly rates. The brief asserts that the issue of whether Mr. Buckley's Answer judicially estopped him from raising the question of interpretation of the contract was irrelevant because the parties tried the issue of "whether Mr. Buckley and Mr. Silva entered into an attorney-client agreement that anticipated a results-oriented fee." I agree, and the majority opinion likewise does not address the issue. Mr. Buckley had also denied in his Answer that the agreement entitled Mr. Silva to more than $185 per hour, a clear indication that the client took a different interpretation of the agreement. Consequently, the Answer squarely raised the question of whether the client and the attorney shared the same understanding of the fee arrangement.

In its amended memorandum the trial court noted that both Mr. Silva and Mr. Buckley appeared to be credible witnesses at trial. The court further stated:

> However, upon thoughtful consideration of their appearance as witnesses in light of all the evidence, the Court finds that Mr. Buckley was not credible on one following point: that he did not reasonably anticipate or expect that he would ever owe Mr. Silva more than a mere $185 per hour for all of Mr. Silva's services rendered under the agreement. Mr. Buckley knew, should have known or at least had reason to know that his final or ultimate fee may very well exceed $185 per hour of Mr. Silva's time once the case was concluded and all the factors had been considered and applied.

This finding is also based on the court's interpretation of the fee agreement as unambiguous, thus providing the basis upon which the client "should have known" or "had reason to know" there was going to be a fee in addition to the total derived from the hourly rate times the hours worked. In fact, in its order denying Mr. Buckley's motion to alter or amend the court applied the parol evidence rule and found that:

> what Mr. Buckley unilaterally may have "understood" in retrospect cannot alter or vary the terms of the unambiguous, clear contract between him and Mr. Silva. "The provision of the agreement says what it means and means what it says."

Thus, the trial court herein, like the Supreme Court in *Alexander II*, found the language of the agreement clear enough to provide evidence of the client's understanding of the fee arrangement that was consistent with the attorney's interpretation and intent. I disagree with that interpretation of the agreement herein. The differences in the language of the agreement in *Alexander* and that used in the agreement in the case before us are significant, and those differences create an entirely different fee arrangement.

Under the agreement in *Alexander*, the client actually agreed to pay a fee defined as a "reasonable amount" taking into consideration various listed factors. In contrast, the agreement at issue herein does not include an agreement to pay a fee of a "reasonable" amount. Instead, the agreement states, "This letter will confirm the basis upon which we have agreed to represent your interests in the above-referenced matter. We will bill you for our services on account on an hourly rate basis." This language expresses an agreement that the attorney will be paid based upon his hourly rate and the number of hours worked.

Although the attorney bases his claim upon language of the agreement providing that the ultimate fee may vary depending upon the factors enumerated, that language, unlike the language in the *Alexander* agreement, does not make it clear that the actual fee is to be an undetermined, unquantifiable "reasonable" amount. In fact, placed as it is immediately after the hourly rate language, the ultimate fee language simply acknowledges that it is impossible to estimate the total number of hours that would be spent on the matter and, therefore, the total or ultimate amount that would be billed.

In addition, the *Alexander* agreement set as a maximum on the reasonable fee amount a percentage of any award to the client. It clearly established as a minimum either the retainer **or** the sum derived from the hours worked multiplied by the hourly rate. Thus, it was apparent that the hourly charges were a minimum and that some amount, with a definite limit, in addition to the minimum might be expected and "reasonable."

Mr. Silva's expert, Mr. Hollins, testified that he also uses a fee arrangement somewhat similar to that intended by Mr. Silva herein in complex litigation involving large sums of money and read the language he uses in such a fee agreement:

> The language in my letter, and you can see the differences in my letter and Mr. Silva's letter, is this: The final bill may include an amount **in addition to** the calculation for time expended, based on the results and difficulty of the matter, the skill required to perform the services properly and the amount involved. (emphasis added.)

The document prepared by Mr. Silva does not include any language making it clear that some amount will be due or expected in addition to or in place of the hourly rate. It also does not establish a maximum. Mr. Silva admitted that the agreement did not include any formulation by which one could calculate, at the time of its signing, a maximum fee, that the agreement did not include any language about an additional fee beyond the hourly rate, and it did not contain any language indicating that the final fee would be discussed at the end of the case. However, he contended that "ultimate" fee meant final fee, that the final fee may vary, depending on the factors listed, and that the results obtained factor could not be applied until that time.

It is true that one of the factors listed is "results obtained," and that factor cannot be determined until after the conclusion of the case.[8] However, its appearance in the list of factors affecting Mr. Buckley's ultimate fee does not serve to put the client on notice that the agreement contemplates an undefined "results-oriented" fee as was Mr. Silva's intent. Further, the written agreement does not define success or any relative degrees thereof, and, therefore, does not reflect a mutual understanding of a successful result from the client's perspective.

The listing of factors in the agreement has a meaning with legal effect to those trained in the law. The factors set out in Tenn. R. S. Ct. 8, DR 2-106 (B) apply to fees set by the courts and are also used to determine the reasonableness of fee provisions in contracts and in the context of a fee dispute between a lawyer and a former client. *Alexander I*, 903 S.W.2d at 695. It cannot be assumed that a non-lawyer, even a sophisticated business person, would know or appreciate the purpose for including the factors. More significantly herein, nothing in the language or listing of factors would alert the reader to the possibility that one factor would predominate the others or that the attorney intended to charge an amount almost three times the hourly billing as a result fee. Even many

---

[8]Mr. Silva also asserts the results obtained factor meant the relative success of his efforts in the litigation, and, as he described it in this situation where he intended a "results-oriented" fee, it was the primary justification for his fee.

experienced attorneys are unfamiliar with the result fee concept or all its various permutations and would not necessarily associate the language used in the agreement herein with that concept. Consequently, it is unlikely that a layperson should have understood the agreement to be a results-oriented fee as described by the attorney.

In addition, "A tribunal should construe a contract between client and lawyer as a reasonable person in the circumstances of the client would have construed it." RESTATEMENT OF THE LAW GOVERNING LAWYERS § 18(2). This includes the fee agreement. *Id.* § 38. I would conclude that a reasonable person in Mr. Buckley's position would have interpreted the written agreement as obligating him to pay a fee based on the hourly rate and the hours worked. That is how he was billed and what he paid. Consequently, I would find that the written agreement does not meet the attorney's burden to show that the client clearly understood the agreement consistently with the attorney's understanding. To the contrary, the written agreement is consistent with the client's expressed understanding.

### IV. AMBIGUITY AND THE PARTIES' UNDERSTANDING

A finding that the written agreement does not establish the first two factors necessary to the enforcement by an attorney of a fee contract raises the question of whether the attorney met his burden through other evidence, namely testimony about the discussions regarding the fee arrangement before the agreement was signed. The trial court found that the parol evidence rule prohibited consideration of Mr. Buckley's understanding of the agreement because Mr. Buckley's testimony could not alter the terms of the agreement which the court had found was unambiguous.[9] Presumably, on the same basis, the court also considered Mr. Silva's testimony about his intent and the parties' discussions equally inadmissible. In fact, nowhere in the trial court's orders does it discuss the testimony of either party about their discussions regarding the nature of the fee agreement prior to its signing. The trial court's decision was simply not based on that testimony.[10]

---

[9]In the trial court's order on Mr. Buckley's motion to alter or amend, the court quoted from Mr. Silva's trial counsel:

> Our position in the case was that the engagement letter said, you'll pay $185 an hour for the current work that we do, but based upon the disciplinary factors, which we cannot yet evaluate, we'll set an ultimate fee at the end of the case. That's really what this is about, and, in my opinion, Mr. Buckley didn't offer any satisfactory explanation as to why that wasn't the agreement of the parties.

Following that statement, the trial court quoted from *Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888, 892 (Tenn. Ct. App. 2000), with regard to the parol evidence rule, stating that parol evidence is not admissible to contradict, vary, or alter a written contract, when a written instrument is valid, complete, and unambiguous. Relying on that authority, the trial court held that the argument of Mr. Silva's counsel must be sustained because Mr. Buckley's testimony could not alter the terms of the agreement which the court had found was unambiguous.

[10]Neither was its credibility finding. The trial court's earlier statement that Mr. Buckley knew or had reason to know he would owe Mr. Silva more than his hourly rate was not based upon the court's weighing of their testimony about their pre-agreement discussions. It was not a finding that the court credited Mr. Silva's testimony over that of Mr.

(continued...)

As the trial court held, parol evidence cannot be considered to vary the terms of an unambiguous written contract. "Since the courts should not look beyond a written contract when its terms are clear, the parol evidence rule provides that contracting parties cannot use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract." *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 610 (Tenn. Ct. App. 1990). However, parol evidence is admissible to uncover and reveal the true intentions of the parties in the event of an ambiguity in the contract. Where the contract is ambiguous, parol evidence is allowed to explain the written agreement. *Jones v. Brooks*, 696 S.W.2d 885, 886 (Tenn. 1985).

Mr. Silva has consistently and adamantly argued in this appeal and throughout the trial that the written agreement is unambiguous and establishes a "results-oriented" fee. While the majority finds the agreement sufficiently ambiguous to allow consideration of other evidence of intent, I would find that the agreement establishes a fee based on the hourly rate, contrary to Mr. Silva's interpretation of the agreement. It is arguable that the inclusion of the "results obtained" factor creates an ambiguity and that such an ambiguity opens up the possibility of consideration of parol evidence to explain the parties' intent. It also, however, calls into play rules of construction courts are to use to resolve any ambiguity.

Under the most applicable of those rules, any ambiguity in the language of the agreement would be construed against the drafter, the attorney. *Alexander I*, 903 S.W.2d at 694. This well-settled principle of contract law applies with greater force to an employment contract between an attorney and client because of the attorney's fiduciary duty to ensure that the client fully understands the agreement consistently with the lawyer's interpretation. Possessing the superior knowledge of contract law and documents of legal import, the lawyer is in the position to prevent ambiguity in the written document. It is the lawyer's responsibility to draft a document that accurately, fully, and clearly reflects the agreement between the parties. The principle of construction against the drafter "surely counts double when the drafter is a lawyer writing on his or her account to a client" because of a lawyer's fiduciary duties. *Beatty v. NP Corp.*, 581 N.E.2d 1311, 1315 (Mass. App. Ct. 1991).

As discussed above, the Restatement adopts as the primary rule of construction for attorney-client contracts, including fee contracts, that such agreements are to be construed from the standpoint of a reasonable person in the client's circumstances. RESTATEMENT OF THE LAW GOVERNING LAWYERS §§ 18, 38. "The lawyer thus bears the burden of ensuring that the contract states any terms diverging from a reasonable client's expectations." *Id.* § 18 cmt. h. The reasons for the rule include the fact that the lawyer is the author, a contract is traditionally interpreted against the author, and the lawyer is more able to detect and correct error, ambiguities, and omissions in the agreement. *Id.* Additionally, rather than applying only when other means of interpreting the contract have been

---

[10](...continued)

Buckley as to the substance of those discussions. Because the court considered the written agreement unambiguous, and parol evidence inadmissible, the court's "credibility" finding is based upon its interpretation of the agreement as unambiguous. Consequently, the well-settled standard of review applicable to credibility determinations by a trial court does not apply to any consideration by this court of the parties' testimony regarding their discussions or understandings of the written agreement.

unsuccessful, "[t]he principle that the contract is construed as a reasonable client would understand it governs the construction of the contract in the first instance." *Id.*

I agree with the Restatement's approach.[11] Unlike the majority's approach of considering other evidence of intent before applying the rule of construction, I would follow the Restatement's approach and apply, in the first instance, the interpretation of a reasonable client. Because any ambiguity in an attorney-client fee agreement was created by the attorney, such an agreement must be interpreted, in the first instance, from a reasonable client's perspective. Reading the agreement herein from that perspective, a reasonable client would interpret the language as creating a fee based upon the time worked and the hourly rate. From that viewpoint, there is no ambiguity.

While I would conclude there is no ambiguity needing clarification when applying the Restatement's rule, to the extent there remains any ambiguity after construction of the written agreement from a reasonable client's perspective, or to the extent evidence of the circumstances surrounding the agreement is necessary in determining whether the attorney has shown a mutual understanding of the agreement, we can consider those circumstances.

Even if the parties' discussions were considered, however, the attorney in this case has not demonstrated that the client clearly and fully understood the agreement as envisioned or intended by the attorney. That conclusion is based, not on any determination of the credibility of either party regarding their discussions, but instead is based upon the omission of critical details in the attorney's explanation, as testified to by the attorney, of the fee arrangement. Those critical details are defined by the lawyer's duty to inform the client of any terms diverging from a reasonable client's expectations, so that the agreement clearly incorporates those terms, as the Restatement puts it. That duty is akin to the well-established duty to provide the client with all the information and advice the lawyer would have given regarding the client's entering into the same transaction with someone else.

## V. THE ATTORNEY'S INTERPRETATION

Mr. Silva interpreted the written agreement as reflecting his intention that the fee would be an amount to be determined after the case was over by application of the factors listed. Mr. Silva has emphasized that he intended a "results-oriented" fee, indicating he considered the "results obtained" factor to be the predominant, if not exclusive, factor in the final or ultimate fee.[12]

---

[11]In the case before us, the attorney also argues that if the written agreement is determined to be so vague as to be unenforceable, he is still entitled to a reasonable fee, and the fee he requested was found to be reasonable based upon expert testimony. This argument is another reason why the written contract should be interpreted against the drafting attorney. If the written agreement supports a reasonable client's understanding that the fee is to be one based upon hourly rate and hours worked, then it should not be set aside because of an ambiguity written into the agreement by the attorney.

[12]In his brief he states the most important of the factors listed were the amount involved and the results obtained. It is clear that a reasonable estimate of the amount involved, *i.e.* Mr. Buckley's property, was known, or discoverable, at the initiation of the representation. Additionally, the existence of and issues raised by the prenuptial
(continued...)

-12-

In the *Alexander II* case, the Supreme Court held that the agreement therein, on its face, provided for a **reasonable fee** with that fee to be determined based upon the expressed factors. The Court stated, "In general, an agreement which utilizes broad terms and does not fix an exact fee is still acceptable." *Alexander II*, 974 S.W.2d at 695.[13] However, the Court specifically found that the agreement at issue was just and reasonable "because it provides for a minimum and maximum fee to be charged." *Id.* In addition, the court stated:

> While no single factor determines reasonableness, on balance we conclude that the fee . . . is reasonable. In sum, because the fee agreement provided both a minimum fee and a protective cap on the fee, and because the fee ultimately charged was based on the reasonable value of services rendered, the attorneys have satisfied the third criterion of *Cooper & Keys*, that the terms of the agreement be just and reasonable.

*Id.* at 697.

Even under Mr. Silva's interpretation of the agreement reached, that agreement provided no maximum, no range of fees, and no quantifiable method for the client to determine his potential maximum liability. Of equal significance, the attorney did not testify that he told the client that, of the factors listed in the agreement, the results obtained factor would predominate or that application of that factor could result in a total fee three times the billed amount.

The relationship between a result based portion of a fee and the portion based on time and effort was considered in *Head v. Head*, 505 A.2d 868 (Md. Ct. Sp. App. 1986), wherein the court reviewed the reasonableness of a fee that was in part result based and there was no prior agreement

---

[12](...continued)
agreement were known at the beginning of the representation, and, to the extent he contends that agreement added to the complexity of the case or that its upholding was a benchmark of his success, the attorney could have factored that into his billing arrangement and tied the "results obtained" factor to it.

[13]The Court further stated,

> This Court has allowed a law firm to enforce a promissory note created pursuant to a similarly worded fee agreement. *See Waller, Lansden, Dortch, & Davis v. Haney*, 851 S.W.2d 131, 132 (Tenn. 1992) (the retainer agreement provided that the firm be paid a reasonable fee based on the amount involved, the time expended, the novelty of the transaction, and the deadlines imposed upon counsel).

*Id.* The initial agreement in that case was for a reasonable fee, based upon the listed factors, as was the agreement in *Alexander II*, but unlike the agreement herein. The Court in *Waller* explained that after the original retainer agreement, the parties had negotiated a specific fee based upon a specified amount per $1,000 value of bonds involved in the closing. The note was prepared after this re-negotiation. The court found that the fee was negotiated "apparently to defendant's satisfaction." 851 S.W.2d at 133.

as to the rate.[14] The court held that in that situation the attorney was entitled to be paid the reasonable value of his services. The court found that while time spent and hourly rate are important factors in determining the reasonableness of a fee, the disciplinary rule includes other factors as well; but, while factors other than time spent may be taken into account, they must produce a reasonable fee. 505 A.2d at 876.

In that case, the hours worked and an assigned reasonable hourly rate of $200 produced a fee, referred to by the court as the "lodestar," of $45,400. The trial court awarded a fee of $120,000. The reviewing court characterized the $75,000 difference as the result fee or result-based bonus. Acknowledging that the results obtained factor may be included in determining a reasonable fee, the court nonetheless determined that the result fee in that case was excessive and held:

> DR 2-106(B), supra lists eight general and several inclusive factors to consider when arriving at the amount to charge a client. The result obtained is but one of those factors. Its prominence in the total fee must bear a reasonable relationship to the time and labor required. An attorney is retained and paid for expending his or her best efforts to secure the best results. Counsel should not be overpaid merely for performing his or her job.

505 A.2d at 877. The court found that the $75,000 result fee did not bear a reasonable relationship to the time and labor required, and because it was more than one and one-half times the lodestar figure, "It no longer serves as a bonus, but instead becomes the primary source of funds for counsel." 505 A.2d at 877.

In the case before us, the total amount billed by Mr. Silva based upon the hours expended and the contract rate per hour was $57,920.57. Accordingly, the $175,000 fee asserted by Mr. Silva was three times the amount reflecting the time and labor spent. Using the language of the *Head* court, the results bonus was twice the hourly billing component. As Mr. Silva's expert testified, the time and labor factor was reflected in the 313 hours Mr. Silva spent on the case. Mr. Silva testified that his bills reflected the time he actually spent on a matter as accurately as possible. Mr. Silva did not testify that he quoted a lower hourly rate than was his custom. He stated that $185 was his base billing rate in 1998, when the agreement was signed, and that it was raised to $200 and $225 in the following year. "So at the conclusion of this case my billing rate would be $225 an hour." He did not raise the rate billed to Mr. Buckley because "that was my contracted base rate under the fee engagement letter." Based upon the hours spent on this case, a fee of $175,000 would result in an hourly rate of $559. The question is not whether this fee is reasonable, but rather whether a reasonable client could have anticipated it from the written agreement or from explanation by the lawyer.

---

[14] Fees were sought pursuant to an agreement between a husband and wife to pay "reasonable fees" incurred in enforcing a separation agreement. The court viewed a portion of its task as determining whether the fee charged to the winning party was reasonable and, therefore, covered by the agreement.

-14-

It is not entirely clear whether our Supreme Court, if called upon to review the reasonableness of a fee in the absence of a specific agreement setting a maximum or establishing the method for computing a result-based fee, would adopt the *Head* court's conclusion that the result component must bear a reasonable relationship to the time and effort spent and that a doubling of the amount attributable to effort would be unreasonable. That is not the precise question before us, however. The question is whether a reasonable client could have understood that the attorney envisioned a predominantly result based fee, when compared with the other factors listed, that tripled the amount based on time and effort factor, where neither the predominance of the results obtained factor nor its relationship to the time and effort factor were disclosed or explained.

In *Alexander II*, accurate contemporaneously kept time records were not produced. Consequently, the Supreme Court chose to "disregard the attempted reconstruction of the attorneys' time records and the allegations of over-staffing and duplicative services" because the reasonable fee agreed to by the parties was not controlled by the hourly rates since the parties clearly agreed to "some leeway beyond the hourly rates." 974 S.W.2d at 696 n.7. Instead, the Court stated

> The time devoted to the case is but one of several factors determining the overall reasonableness of the fee charged. Because it is clear that the attorneys put innumerable hours into Inman's case, the time and labor factor suggests that the $501,514.50 fee is reasonable.

*Id.*

Not only in this footnote, but also it its analysis of the reasonableness of the fee, the Court made it clear that all of the factors enumerated in the agreement had to be considered. Because the Court had no accurate numbers regarding the hours actually worked it did not, and could not, compare the time and labor factor to the total fee or any other component. However, the Court's finding that the time and labor factor suggested the reasonableness of the fee indicates that the Court recognized that some reasonable relationship between that factor and the total fee is necessary.

A reasonable client told that the fee would be determined based on all the factors listed in the agreement would not assume that one factor, the results obtained, would predominate. Similarly, a reasonable client would anticipate that the results obtained factor would have a reasonable, and I think identifiable, relationship to the factor of hourly rates for time expended. Consequently, the attorney's intent contrary to these reasonable expectations was required to be disclosed to and explained to the client. RESTATEMENT OF THE LAW GOVERNING LAWYERS § 18, cmt. h. Since there was no testimony herein that it was, the attorney has failed to meet his burden of establishing an agreement for a "results-oriented" fee.

By this discussion of the relationship between the time and labor factor and the results factor, or the relationship among all the factors, I do not mean to suggest that an attorney and client cannot agree to a fee arrangement giving disproportionate emphasis to the results obtained or any other factor. As the *Head* court stated, if the attorney and client in that case had agreed to a result fee of

$75,000, there would have been no question of the propriety of the agreement. *Head*, 505 A.2d at 878. Similarly, the fact that the attorneys and client in *Alexander II* agreed to a fee based upon the reasonableness factors whose maximum was set at a percentage of the property awarded made the agreement enforceable because the client was clearly on notice of her maximum potential liability. 974 S.W.2d at 697.

That is simply not the situation before us. The attorney herein seeks to enforce his interpretation of a written agreement that in my opinion does not reflect that interpretation. Neither has he met his burden of proving that the client had an understanding of the fee agreement that was consistent with his own since in neither the written agreement nor in his discussions with the client did he advise the client of critical details of his intent regarding a "results-oriented" fee. Consequently, I would find that the attorney has not proved an agreement to pay a result based fee and is not entitled to enforcement of his intent to charge such a fee.

Let me be clear. I do not intend to imply in any way that the fee arrangement envisioned or intended by the attorney was improper or unreasonable. It was simply a failure to clearly convey his intent so that he could show that the client understood that intent that compels my conclusion. Armed with that understanding, the client could have made an informed choice whether to proceed with the arrangement, negotiate different terms, or hire another lawyer on terms acceptable to him.

_____
PATRICIA J. COTTRELL, JUDGE